OPINION OF THE COURT
Simons, J.
In our earlier decision in this case (65 NY2d 566), we held that the issuing magistrate erred in approving a warrant authorizing the seizure of video cassette films as evidence that defendants were promoting obscenity. The warrants were void, we said, although supported by police affidavits itemizing several scenes of patently offensive sexual conduct, because *299 the evidence before the magistrate did not establish probable cause to believe that the films were obscene within the three-part definition of Penal Law § 235.00. On certiorari review the Supreme Court of the United States found the evidence satisfied the requirements of the Fourth Amendment to the Federal Constitution and it therefore reversed our decision and remanded the case to us so that we could decide whether article I, § 12 of the State Constitution[1] imposes a more exacting standard for the issuance of search warrants authorizing the seizure of allegedly obscene material than does the Federal Constitution (People v P. J. Video, 65 NY2d 566, 572, revd & remanded New York v P. J. Video, 475 US —, 106 S Ct 1610). We hold that it does and we therefore affirm the order of County Court suppressing the films.
I
The appeal arises from proceedings instituted in the Village of Depew Justice Court charging defendants with multiple counts of obscenity in the third degree based upon their knowing possession, with intent to promote, of allegedly obscene video cassette films (Penal Law § 235.05 [1]). After arraignment, defendants moved to suppress the films contending that the warrant authorizing seizure was not based on probable cause. Justice Court granted the motion and dismissed the informations. County Court affirmed its order and a Judge of this court granted the People leave to appeal. Upon review we addressed both procedural and substantive issues. The procedural issue concerned the extent of the inquiry a magistrate must make before issuing a warrant to seize materials that may enjoy First Amendment protection.[2] Inasmuch as the magistrate had not viewed the films nor questioned the *300 police but rather relied solely on the police officer’s affidavit for each film, the substantive issue posed was whether the affidavits presented sufficient evidence to enable the magistrate to make an objective determination that there existed probable cause to seize the films because they constituted the fruits, instrumentalities or evidence of a crime. Applying established law, we resolved the procedural issue by stating that the determination of probable cause had to be made by the magistrate, not the police, that it had to be made from information submitted or available to him, and that — because the materials presumptively enjoyed First Amendment protection — the magistrate was required to perform his duty with "scrupulous exactitude” (People v P. J. Video, 65 NY2d 566, 569-570, supra, citing Stanford v Texas, 379 US 476, 481-485). We held that the magistrate was not required to view the films, or even supplement the affidavits by questioning the investigating officers. If he relied solely on affidavits, however, the allegations contained in them had to satisfy the legal standards of probable cause, i.e., the information must be sufficient to warrant a person of reasonable caution in the belief that a crime has been committed or that evidence of a crime would be found in a particular place (see, e.g., People v Bigelow, 66 NY2d 417, 423; Wong Sun v United States, 371 US 471, 479; see also, 1 LaFave, Search and Seizure § 3.1 [b]; § 3.7 [d]).
On the substantive issue, we noted that before a person may be found guilty of promoting obscenity the materials he promotes must be more than sexually explicit, they must be obscene under the statutory definition. That definition contains three elements: the material must not only be patently offensive but also, when considered as a whole and judged by the average person applying contemporary community standards, its predominant appeal must be to prurient sex, and it must lack serious literary, artistic, political and scientific value (see, People v P. J. Video, 65 NY2d 566, 572, supra [construing Penal Law §235.00 (l)]).[3] Acknowledging that, in this case, the magistrate had cause to believe that the films *301 violated paragraph (b) of the statutory definition, we held that he nevertheless erred because the affidavits on which he acted contained only an itemized list of sexual acts, and the police officer’s conclusory assertion that the list represented the "content and character” of the films or that such scenes appeared "throughout” the films. Accordingly, we held the magistrate did not have probable cause to support issuance of a warrant to seize the films as evidence of the crime of promoting obscenity because he had permitted the police officer to make the determination for him that the films as a whole appealed predominantly to prurient sex and lacked value (People v P. J. Video, 65 NY2d 566, 572, supra).
On certiorari review, the Supreme Court judged probable cause by applying the totality of the circumstances/fair probability test of Illinois v Gates (462 US 213). The Gates rule originally was adopted to test the reliability of anonymous informants’ tips. It overruled the established two-pronged Aguilar-Spinelli test (Aguilar v Texas, 378 US 108; Spinelli v United States, 393 US 410) which required a court to review both the basis of the informant’s knowledge and the reliability of his information, to permit a magistrate to now decide whether, given all the circumstances set forth in the police affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place. In this case, the Supreme Court extended the reach of this "totality of the circumstances/fair probability” standard and applied it, for the first time, to an obscenity case to permit the magistrate to focus generally on the explicit nature of pornographic material without specifically considering the other statutory elements of the crime (see, New York v P. J. Video, 475 US —, 106 S Ct 1610, 1615-1616, supra [construing Gates]). Having done so, it remanded the case to us for our further consideration.
II
State courts are bound by the decisions of the Supreme *302 Court when reviewing Federal statutes or applying the Federal Constitution. Under established principles of federalism, however, the States also have sovereign powers. When .their courts interpret State statutes or the State Constitution the decisions of these courts are conclusive if not violative of Federal law. Although State courts may not circumscribe rights guaranteed by the Federal Constitution, they may interpret their own law to supplement or expand them (see, e.g., PruneYard Shopping Center v Robins, 447 US 74, 81; Cooper v California, 386 US 58, 62; see also, 1 Rotunda, Nowak and Young, Constitutional Law § 1.6 [a]; see, Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv L Rev 489 [1977]). Thus, notwithstanding that the evidence before the magistrate was sufficient to establish probable cause under the Federal Constitution, we have the power on remand to interpret article I, § 12 of the New York Constitution as requiring more. We turn then to the question whether we should measure probable cause in this case by different standards under the State Constitution.
Courts and commentators have identified many considerations and concerns upon which a State court may rely when determining that its Constitution accords greater protection to individual liberties and rights than the protection guaranteed by the Federal Constitution (see generally, State v Hunt, 91 NJ 338, 450 A2d 952 [Handler, J., concurring]; Symposium: Emergence of State Constitutional Law, 63 Tex L Rev 959-1318 [1985]; Galie, The Other Supreme Courts: Judicial Activism Among State Supreme Courts, 33 Syracuse L Rev 731 [1982]; Developments in the Law: The Interpretation of State Constitutional Rights, 95 Harv L Rev 1324-1502 [1982]; Howard, State Courts and Constitutional Rights in the Day of the Burger Court, 62 Va L Rev 873, 934-944 [1976]). One basis for relying on the State Constitution arises from an interpretive review of its provisions. If the language of the State Constitution differs from that of its Federal counterpart, then the court may conclude that there is a basis for a different interpretation of it (see, Maltz, Dark Side of State Court Activism, 63 Tex L Rev 995, 1000-1001). Such an analysis considers whether the textual language of the State Constitution specifically recognizes rights not enumerated in the Federal Constitution; whether language in the State Constitution is sufficiently unique to support a broader interpretation of the individual right under State law; whether the history of the adoption of the text reveals an intention to make the State provision coextensive *303 with, or broader than, the parallel Federal provision; and whether the very structure and purpose of the State Constitution serves to expressly affirm certain rights rather than merely restrain the sovereign power of the State. To contrast, noninterpretive review proceeds from a judicial perception of sound policy, justice and fundamental fairness (see, id., at 1001). A noninterpretive analysis attempts to discover, for example, any preexisting State statutory or common law defining the scope of the individual right in question; the history and traditions of the State in its protection of the individual right; any identification of the right in the State Constitution as being one of peculiar State or local concern; and any distinctive attitudes of the State citizenry toward the definition, scope or protection of the individual right.
Our determination rests on noninterpretive grounds. We rely principally on established Federal and State law because we believe the arguments supporting that body of law are more persuasive than the arguments supporting application of the Gates rule in this obscenity case, and are consistent with the admonition of an earlier Supreme Court that constitutional provisions for the security of persons and property are to be liberally construed (see, Boyd v United States, 116 US 616, 634). Our decision, however, is also based on principles of federalism and on New York’s long tradition of interpreting our State Constitution to protect individual rights. In this case, we consider two fundamental rights, the right of free expression and the right of citizens to be free from unlawful governmental intrusions.
Ill
In the past we have frequently applied the State Constitution, in both civil and criminal matters, to define a broader scope of protection than that accorded by the Federal Constitution in cases concerning individual rights and liberties (see, e.g., Rivers v Katz, 67 NY2d 485 [right of involuntarily committed mental patients to refuse antipsychotic medication]; Bellanca v State Liq. Auth., 54 NY2d 228, cert denied 456 US 1006 [blanket ban on topless dancing]; Sharrock v Dell Buick-Cadillac, 45 NY2d 152 [statutory provisions for foreclosure of garageman’s possessory lien]; People v Isaacson, 44 NY2d 511 [due process limits on police conduct]; People v Hobson, 39 NY2d 479 [right to counsel]; see generally, Galie, State Constitutional Guarantees and Protection of Defendants’ Rights: The *304 Case of New York 1960-1978, 28 Buffalo L Rev 157 [1979]). Our conduct in the area of Fourth Amendment rights has been somewhat more restrained because the history of section 12 supports the presumption that the provision "against unlawful searches and seizures contained in NY Constitution, article I, § 12 conforms with that found in the 4th Amendment, and that this identity of language supports a policy of uniformity between State and Federal courts” (People v Johnson, 66 NY2d 398, 406).[4] Based on this, we have sought to fashion search and seizure rules that promote consistency in the interpretations we have given these parallel clauses (see, id., at pp 406-407 [citing People v Gonzalez, 62 NY2d 386 (inventory search of closed container); People v Ponder, 54 NY2d 160 ("automatic standing” rule); People v Roman, 53 NY2d 39 (inventory search of cigarette case)]). The interest of Federal-State uniformity, however, is simply one consideration to be balanced against other considerations that may argue for a different State rule. When weighed against the ability to protect fundamental constitutional rights, the practical need for uniformity can seldom be a decisive factor (see, Developments in the Law, op. cit, 95 Harv L Rev, at 1395; see also, Galie, State Constitutional Guarantees and Protection of Defendants’ Rights: The Case of New York 1960-1978, 28 Buffalo L Rev 157). Thus, notwithstanding an interest in conforming our State Constitution’s restrictions on searches and seizures to those of the Federal Constitution where desirable, this court has adopted independent standards under the State Constitution when doing so best promotes "predictability and precision in judicial review of search and seizure cases and the protection of the individual rights of our citizens” (People v Johnson, 66 NY2d 398, 407, supra; see also, People v Class, 67 *305 NY2d 431, on remand from New York v Class, 475 US —, 106 S Ct 960 [search for vehicle identification number predicated on stop for traffic violation]; People v Gokey, 60 NY2d 309 [warrantless search incident to arrest]; People v Belton, 55 NY2d 49, on remand from New York v Belton, 453 US 454 [automobile exception to warrant requirement]; People v Elwell, 50 NY2d 231 [probable cause predicated on informant’s tip]; People v Marsh, 20 NY2d 98 [search incident to motor vehicle stop]). In addition, we have sought to provide and maintain "bright line” rules to guide the decisions of law enforcement and judicial personnel who must understand and implement our decisions in their day-to-day operations in the field. To this end, we have rejected the reasoning behind the so-called good-faith exception to the warrant requirement recently articulated by the Supreme Court, refusing, on State constitutional grounds, to apply it (see, People v Bigelow, 66 NY2d 417, 426-427, supra [discussing United States v Leon, 468 US 897; Massachusetts v Sheppard, 468 US 981]). Similarly, although asked to do so, we have not reached out to adopt the Gates "totality of the circumstances” test in warrant cases (see, 66 NY2d, at pp 424-425), and we have declined to extend it to review warrantless arrests predicated on hearsay information (see, People v Johnson, 66 NY2d 398, 407, supra; People v Landy, 59 NY2d 369, 375).
These decisions reflect a concern that the Fourth Amendment rules governing police conduct have been muddied, and judicial supervision of the warrant process diluted, thus heightening the danger that our citizens’ rights against unreasonable police intrusions might be violated. We see the Supreme Court’s present ruling as a similar dilution of the requirements of judicial supervision in the warrant process and as a departure from prior law on the subject. As we read the court’s decision, it condones a probable cause determination by a magistrate based only upon the strength of the showing of probable cause as it relates to one of several necessary elements of the crime involved. While the "totality of the circumstances/fair probability” formulation may satisfy some as an acceptable analytical framework when used to evaluate whether an informant’s tip should be credited as one element bearing on probable cause, the argument for its validity breaks down where, as here, the standard is applied in a different, nonhearsay, probable cause context. In Gates, all available pertinent information known to the police was presented to the magistrate, and brought to bear on the issue *306 of whether the informant’s tip was creditable, to establish the elements of a crime (see, 462 US 213, 225-227, supra). In this case, the Supreme Court’s "totality of the circumstances/fair probability” approach sanctioned a determination of probable cause based solely on the police affiant’s showing that the films contained numerous sexually explicit scenes and his conclusory assértions that the scenes were representative of the films as a whole (see, New York v P. J. Video, 475 US —, 106 S Ct 1610, 1615-1616, supra). According to the Supreme Court, the magistrate’s action in issuing the warrant was acceptable because the court deemed the evidence of explicit, offensive sexual content sufficiently strong to compensate for the officer’s failure to submit evidence that the films lacked intrinsic worth and violated community standards.[5]
Several years ago we summarized our past decisions on the subject, restating a rigorous, fact-specific standard of review imposed upon the magistrate determining probable cause.
"The existence of probable cause is a determination solely for the Magistrate, not the affiant, and should only be made when probable cause has been demonstrated as a matter of fact in the manner prescribed by statute (CPL art 690) and decisional law (see, e.g., People v Marshall, 13 NY2d 28, supra; People v Brady, 16 NY2d 186).
* * *
"Therefore when the Magistrate undertakes this factual determination, he should consider all aspects of the information supporting the application. Of particular relevancy in this process is an evaluation of the sources of information and the manner in which it was acquired. The Magistrate should also consider the experience and expertise of the officers involved and the extent to which the information has been verified. Further attention should be given to the nature of the crime and the exigencies, if any, involved. In sum, the Magistrate *307 must evaluate the search warrant application consistent with these and other considerations which evince reliability.
"Where it appears that the Magistrate has conducted such a measured and comprehensive examination into the basis for the warrant, the factual determination as to probable cause will, of itself, constitute a suitable makeweight when the warrant is challenged (People v Williams, 20 NY2d 388; Ker v California, 374 US 23). By the same token, where the Magistrate merely acts as a rubber stamp the validity of the warrant will be suspect.”
(People v Hanlon, 36 NY2d 549, 559, supra [emphasis supplied].) That decision established a clear and definable standard of review. It imposed a specific, nondelegable burden on the magistrate which required that he, not the police, determine probable cause, and it required that his determination be objectively verifiable (see, Beck v Ohio, 379 US 89, 97; cf. United States v Leon, 468 US 897, supra; and see generally, 1 LaFave, Search and Seizure § 3.2 [b]). This is the standard that should be applied to protect the rights of New York citizens.
Our decision to rely on article I, § 12, rather than on the Supreme Court’s Fourth Amendment pronouncement in this case, is motivated also by concerns of federalism and separation of powers (cf. Maltz, op. cit., 63 Tex L Rev, at 1016-1023 [discussing institutional factors justifying independent State court review]). The States exist as sovereign entities independent of the national Government and the Tenth Amendment reserves to them and the people "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States” (US Const 10th Amend). Thus, the "structure of state governments and their sphere of operations simply are not the subjects of the Constitution, except insofar as the Constitution shifts power from the states to the national government, or protects the rights of individuals from governmental violations” (Tribe, American Constitutional Law § 5-20, at 300). One of the powers reserved to the States is the power to define what conduct shall be criminal within its borders. As Justice Marshall noted in his dissent, the determination whether a work is obscene and therefore criminal — or a determination whether probable cause exists to believe a work violates State proscriptions against obscenity — is a "matter of state law and the rightful province of the state courts” (New York v P. J. Video, 475 US —, 106 S Ct 1610, 1619, supra *308 [Marshall, J., dissenting]). New York courts, pursuant to an express statutory enactment, are bound to construe our Penal Law and its provisions according to the fair import of their terms in order to promote justice and effect the objects of the law (see, Penal Law § 5.00; McKinney’s Cons Laws of NY, Book 1, Statutes § 276). We have interpreted this requirement to mean that criminal responsibility cannot be extended beyond the fair scope of the relevant penal statute (see, People v Gottlieb, 36 NY2d 629, 632). Additionally, a warrant to search and seize cannot issue absent a magistrate’s careful consideration of the elements of the crime involved and a seárching review of the facts alleged to support the affiant’s belief that this crime has been committed (see, People v Hanlon, 36 NY2d 549, 559, supra). Given that our Legislature, consonant with Federal constitutional mandates (see, Miller v California, 413 US 15, supra), has determined that an offensive, explicit depiction of sexual conduct, standing alone, is not obscene (see, Penal Law § 235.00 [1]), neither an issuing magistrate nor a reviewing court can legitimately override that legislative intent and find probable cause that the crime of obscenity has been committed based solely on a showing that sexually oriented material is explicit and offensive (see, People v Heller, 33 NY2d 314, 332-334, on remand from Heller v New York, 413 US 483 [construing Penal Law former § 235.00 in light of Miller v California, 413 US 15, supra]). The Supreme Court’s decision in this case has, in effect, stated that certain elements of our statutory definition of a crime are not significant. We are not free to similarly ignore or recast the legislative mandate.
Finally, it should be noted that obscenity cases differ from other crimes because, by definition, they are predicated on contemporary community standards. While fundamental First Amendment restraints on State power do not vary from community to community, "[p]eople in different States vary in their tastes and attitudes, and this diversity is not to be strangled by the absolutism of imposed uniformity” (Miller v California, 413 US 15, 33, supra [Burger, Ch. J.]). When viewed as a whole, a challenged work may be a valueless piece of pornography, appealing only to the prurient interests, and the proof before the magistrate may establish this in the view of the reviewing Judges. But the work is not criminally obscene unless so judged when applying contemporary community standards. The parameters of the "community” whose standard is to be applied are not only nonnational, but also *309 are to be defined according to State law (see, People v Heller, 33 NY2d 314, 323, supra [adopting a State-wide community standard for New York, rather than a locality-based one]). Thus, New York law requires the magistrate, or the finder of fact at trial, to determine the average New Yorker’s evaluation of, and reaction to, the challenged material (see, United States v Various Arts. of Obscene Mdse., 709 F2d 132, 135-136). This perception of "the average New Yorker” involves a mix of factors peculiar to this State, including our legal traditions and our cultural and historical position as a leader in the educational, scientific and artistic life of our country, as well as a recognition that New York is a State where freedom of expression and experimentation has not only been tolerated, but encouraged.
The legal reasoning supporting our views, our understanding of principles of federalism, and this State’s legal and cultural traditions all lead us to conclude that we should depart from the Federal rule stated in this case. We hold, therefore, that this warrant application did not demonstrate the probable cause required under the provisions of article I, § 12 of the State Constitution and accordingly, on reargument following remand from the United States Supreme Court, we affirm the order of the County Court.

. Article I, § 12 provides, in pertinent part: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.”

. In response to the dissent (dissenting opn, point I, at pp 312-318), we would merely point out that our original opinion cited Maryland v Macon (472 US 463); Roaden v Kentucky (413 US 496); Stanford v Texas (379 US 476); and Marcus v Search Warrant (367 US 717) solely on this procedural issue, to determine whether the magistrate had adhered to the warrant process (see, People v P. J. Video, 65 NY2d 566, 567-570). We did not in our prior opinion, nor do we in this opinion, apply those cases to require that a higher level of substantive proof be submitted to the magistrate.

. Penal Law § 235.00 (1) defines "Obscene” as follows: "1. 'Obscene.’ Any material or performance is 'obscene’ if (a) the average person, applying contemporary community standards, would find that considered as a whole, its predominant appeal is to the prurient interest in sex, and (b) it depicts or describes in a patently offensive manner, actual or simulated: sexual intercourse, sodomy, sexual bestiality, masturbation, sadism, masochism, excretion or lewd exhibition of the genitals, and (c) considered as a whole, it lacks serious literary, artistic, political, and scientific value. Predominant appeal *301 shall be judged with reference to ordinary adults unless it appears from the character of the material or the circumstances of its dissemination to be designed for children or other specially susceptible audience.” This statutory definition resulted from the Legislature’s 1974 amendments to the obscenity law which sought to bring New York’s definition into conformity with the Supreme Court formulation of obscenity articulated in Miller v California (413 US 15) (see, Hechtman, Practice Commentary, McKinney’s Cons Laws of NY, Book 39, Penal Law § 235.00, p 196).

. The guarantee against unreasonable searches and seizures found in section 12 was originally contained in a statute, Civil Rights Law § 8, and there is little in the section’s textual language, the history of its incorporation into the State Constitution in 1938, or the purpose of the incorporation which would support an interpretation that it was to be applied more expansively than the Fourth Amendment. Indeed, for over 100 years it was not deemed necessary to incorporate the guarantee into the State Constitution because the statutory provision, now section 12, was deemed generally coextensive in scope with the Fourth Amendment. Before the Supreme Court decisions in Wolf v Colorado (338 US 25) and Mapp v Ohio (367 US 643), the only difference between the two was in the application of the exclusionary rule (see generally, 1938 NY State Constitutional Convention Committee, Problems Relating to the Bill of Rights and General Welfare, at 215-218). Accordingly, we do not rely on textual or historical distinctions from the Federal Constitution to support our decision.

. Contrary to the contention found in point II of the dissent (at pp 318-319), the Supreme Court did rely upon the totality of the circumstances/fair probability standard enunciated for the first time in its recent decision, Illinois v Gates (462 US 213). Gates was the only decision cited or quoted in the opinion to define the substantive test of probable cause. The court employed the language of Gates to reach a determination that the magistrate was given "more than enough information to conclude that there was a 'fair probability’ that the movies satisfied the first and third elements of the statutory definition” (New York v P. J. Video, 475 US —, 106 S Ct 1610, 1616).